IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs October 13, 2014

IN RE CHELSIA J. ET AL.

Appeal from the Chancery Court for Campbell County
No. 2012-CV-28    John D. McAfee, Judge[1]

No. E2014-00632-COA-R3-PT-FILED-DECEMBER 16, 2014

This is a termination of parental rights case, focusing on Chelsia J. and Jared J., the minor children ("Children") of Fleesha J. ("Mother") and Mark F. ("Father"). The Children were taken into protective custody by the Tennessee Department of Children's Services ("DCS") on April 28, 2011, upon investigation of the Children's exposure to controlled substances in the parents' home. On March 21, 2012, DCS filed a petition to terminate the parental rights of both parents. Following a bench trial conducted over the course of four days spanning more than a year's time, the trial court found that grounds existed to terminate the parental rights of both parents upon its finding, by clear and convincing evidence, that (1) the parents abandoned the Children by failing to provide a suitable home, (2) the parents abandoned the Children by engaging in conduct prior to incarceration that exhibited wanton disregard for the Children's welfare, (3) the parents failed to substantially comply with the reasonable responsibilities and requirements of the permanency plans, and (4) the conditions leading to the Children's removal from the home persisted. At that time, however, the court denied the petition based upon its finding that termination was not in the best interest of the Children. DCS subsequently filed a motion to alter or amend the judgment. Following a subsequent hearing, the trial court granted the motion to alter or amend the judgment and terminated the parental rights of both parents upon its finding, by clear and convincing evidence, that termination was in the best interest of the Children. Mother has appealed.[2] We reverse the trial court's finding that Mother abandoned the Children by engaging in conduct prior to incarceration that exhibited wanton disregard for the Children's welfare. We affirm the trial court's judgment in all other respects, including the termination of Mother's parental rights.

---

[1]Sitting by interchange.

[2]Father is not a party to this appeal.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court
Affirmed in Part, Reversed in Part; Case Remanded**

THOMAS R. FRIERSON, II, J., delivered the opinion of the Court, in which CHARLES D. SUSANO, JR., C.J., AND D. MICHAEL SWINEY, J., joined.

Robert R. Asbury, Jacksboro, Tennessee, for the appellant, Fleesha J.

Robert E. Cooper, Jr., Attorney General and Reporter, and Kathryn A. Baker, Assistant Attorney General, Nashville, Tennessee, for the appellee, Tennessee Department of Children's Services.

**OPINION**

I.  Factual and Procedural Background

DCS initially became involved with the family in response to a December 10, 2010 referral alleging exposure of the Children to controlled substances.  At the time, Chelsia was two years old, and Mother was eight months pregnant with Jared.  A DCS investigator attempted to interview Mother but found her uncooperative.  Mother refused to submit to a drug screen and upon a follow-up visit, could not be located.  DCS received a second referral on April 28, 2011, following Mother's arrest on drug-related charges.  At that time, the Children were two years old and three months old respectively.

Upon investigation, DCS was unable to locate Father and removed the Children from the parents' home on April 28, 2011.  The Children were placed with neighbors, R.D. and V.D., who knew the Children and volunteered to care for them.  The Children were subsequently brought into foster care on May 12, 2011, although they remained with the same caregivers, R.D. and V.D., who became the Children's foster parents.  On May 19, 2011, the Campbell County Juvenile Court entered an emergency protective custody order placing the Children in DCS custody and finding that DCS had made reasonable efforts to prevent removal of the Children from the parents' home. Following a proceeding conducted on August 18, 2011, at which both parents waived their respective rights to an adjudicatory hearing, the Juvenile Court adjudicated the Children dependent and neglected in an order entered September 8, 2011.

It is undisputed that when the parents waived their respective rights to an adjudicatory hearing, they stipulated to the facts alleged in DCS's amended petition for temporary custody, which was subsequently admitted as an exhibit, without objection, during the termination proceedings.  According to these stipulated facts, Mother was arrested on April

28, 2011, after she was found by police officers in a vehicle parked in front of an abandoned house in the company of a man who possessed a baggie containing some methamphetamine and two partially loaded syringes. The man, unidentified in the petition, had run from the vehicle as officers approached, but he was subsequently caught and transported to the hospital after he admitted swallowing three grams of methamphetamine. Mother had needle marks "all over the bend of both arms" according to the petition.

Responding to a consequent referral requesting a welfare check on the Children, DCS case manager Brandi Smith found Jared at a residence in the care of a woman who claimed to be his grandmother. The woman could not remember the infant's name and appeared to be intoxicated.[3] A police officer accompanying Ms. Smith observed what appeared to be a pill grinder, a burnt spoon, and used marijuana roaches at the residence. Ms. Smith proceeded to a neighboring residence, where she found Chelsia in the care of a non-relative, S.W., who lived at the residence with her husband. S.W. was seventeen years old and had been caring for Chelsia for three days. S.W. told Ms. Smith that Mother had dropped off Chelsia with only four diapers and two outfits on the previous Monday, April 25, 2011. S.W. had attempted to contact Mother the following day on April 26 to have her retrieve Chelsia, but S.W. had been unable to locate Mother.

According to the stipulated facts of the petition, Ms. Smith interviewed Mother on or about April 28, 2011, while Mother was incarcerated. Mother disclosed that she had been "shooting up" methamphetamine or "whatever was in the needle" with Father for approximately three weeks since Father was released from jail. Mother told Ms. Smith that she used to "snort pills" and acknowledged that she had a drug problem. At that time, Mother explained that she did not believe the Children should be with Father because of his drug problem.

During the termination proceedings, Mother questioned the truth of the facts to which she had stipulated during the dependency and neglect proceedings, but she was unable to specifically dispute them. When questioned regarding whether she was with Father on the day she was arrested, Mother answered: "No -- I don't know. I was so out of my mind. I don't even know." When further questioned regarding whether Ms. Smith had misrepresented the jailhouse interview, Mother stated: "I don't know. I was high." Mother acknowledged that upon her April 28, 2011 arrest, she tested positive for "marijuana, opiates, and methamphetamine" in her system. According to Mother's criminal history, admitted at trial, the April 28, 2011 arrest resulted in a conviction for possession of drug paraphernalia, a Class A misdemeanor. Mother incurred a sentence of eleven months and twenty-nine days, which was deferred upon Mother's paying court costs.

---

[3]At trial, Mother testified that this caregiver was actually her great grandmother.

Prior to filing the petition for termination of parental rights, DCS developed two permanency plans for the Children. The first permanency plan was established on June 8, 2011, and ratified by the Juvenile Court on August 18, 2011. Under the plan, Mother's responsibilities and requirements were that she visit the Children at least 4.3 hours per month with age-appropriate food or other supplies in hand; attend meetings and court hearings regarding the Children; complete an alcohol and drug assessment and follow attendant recommendations; pass scheduled and random drug screens; complete a mental health assessment and follow attendant recommendations; complete parenting education classes and demonstrate parenting skills learned during visitation; provide a "reliable, stable, safe living environment, free from drug use, harm or abuse"; seek employment and provide proof of her search for or ultimate employment; resolve "legal issues"; and pay child support "as ordered." The stated goal of the first permanency plan was to reunify the Children with the parent and/or have the Children exit protective custody with a relative.

The second permanency plan was established on December 14, 2011, and ratified by the Juvenile Court on February 8, 2012. Mother's responsibilities and requirements under the second permanency plan remained the same as in the first plan. Within the second plan, DCS revised its stated goal to either reunify the Children with the parent or to seek adoption for the Children in the event that reunification efforts proved unsuccessful.

On March 21, 2012, DCS filed a petition with the Campbell County Chancery Court ("trial court") to terminate the parental rights of both parents, alleging grounds of abandonment by failure to provide a suitable home, abandonment by an incarcerated parent (as to both parents), substantial noncompliance with the permanency plans, and persistence of the conditions leading to removal of the Children from the parents' home. Following a hearing upon an affidavit of indigency filed by Mother, Chancellor Billy Joe White entered an order on May 1, 2012, appointing counsel for Mother and a guardian *ad litem* to represent the Children. Chancellor White also conducted an initial hearing on May 22, 2012, and entered an order that day, *inter alia*, setting trial for July 10, 2012. Due to Chancellor White's subsequent illness, Circuit Judge John D. McAfee heard the case by interchange thereafter.

A bench trial commenced on July 10, 2012, during which the trial court heard the testimony of several witnesses, including the Children's maternal grandmother, Vanessa J. ("Grandmother"). At the close of that day's proceedings, the court continued the trial to allow Grandmother an opportunity to file an intervening petition. Grandmother subsequently filed an intervening petition seeking custody of the Children on July 27, 2012. The bench trial reconvened a year later and was held over the course of three additional days: July 12, 2013; July 22, 2013; and August 16, 2013. Grandmother failed to appear during the July and August 2013 proceedings and did not further pursue her intervening petition.

In an order entered November 18, 2013, the trial court found that grounds existed to terminate the parental rights of both parents. As pertinent to Mother's appeal, the court found, by clear and convincing evidence, that (1) Mother abandoned the Children by failing to provide a suitable home, (2) Mother abandoned the Children by engaging in conduct prior to incarceration that exhibited wanton disregard for the Children's welfare, (3) Mother failed to substantially comply with the reasonable responsibilities and requirements of the permanency plans, and (4) the conditions leading to the Children's removal from Mother's home persisted. The court also specifically found that DCS had made reasonable efforts to assist Mother in establishing a suitable home and substantially complying with the permanency plans.

The trial court further found in its November 18, 2013 order, however, that DCS had failed to establish clear and convincing evidence that termination of parental rights would be in the Children's best interest. Although the court credited testimony that the Children were flourishing in the foster parents' care and that the foster parents wished to adopt the Children, the court expressed concern that DCS could not assure that adoption by the foster parents would definitely take place upon termination of Mother's and Father's parental rights. The court therefore denied the petition and determined that the Children should remain in protective custody and foster care.

DCS subsequently filed a motion to alter or amend the judgment pursuant to Tennessee Rule of Civil Procedure 59.04. Following a hearing conducted on February 10, 2014, the trial court determined that its prior ruling regarding the best interest of the Children had been inconsistent with relevant statutes and precedent. The court entered an amended final judgment on March 4, 2014, finding by clear and convincing evidence that termination of Mother's and Father's parental rights was in the Children's best interest. Mother timely appealed.

II. Issues Presented

On appeal, Mother presents three issues, which we have restated as follows:

1.     Whether the trial court erred by finding clear and convincing evidence of grounds to terminate Mother's parental rights to the Children, particularly that (1) Mother abandoned the Children by failing to provide a suitable home, (2) Mother abandoned the Children by engaging in conduct prior to her incarceration that exhibited wanton disregard for the welfare of the Children, (3) Mother failed to substantially comply with the responsibilities and

requirements of her permanency plans, and (4) the conditions leading to the Children's removal from Mother's home persisted.

2. Whether the trial court erred by finding that DCS made reasonable efforts to assist Mother in substantially complying with the responsibilities and requirements set forth in her permanency plans.

3. Whether the trial court erred by finding clear and convincing evidence that it was in the best interest of the Children to terminate Mother's parental rights.

## III. Standard of Review

In a termination of parental rights case, this Court has a duty to determine "whether the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence." *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006). The trial court's findings of fact are reviewed *de novo* upon the record, accompanied by a presumption of correctness unless the evidence preponderates against those findings. *Id.*; Tenn. R. App. P. 13(d). Questions of law, however, are reviewed *de novo* with no presumption of correctness. *In re Bernard T.*, 319 S.W.3d 586, 597 (Tenn. 2010). The trial court's determinations regarding witness credibility are entitled to great weight on appeal and shall not be disturbed absent clear and convincing evidence to the contrary. *See Jones v. Garrett,* 92 S.W.3d 835, 838 (Tenn. 2002).

"Parents have a fundamental constitutional interest in the care and custody of their children under both the United States and Tennessee constitutions." *Keisling v. Keisling*, 92 S.W.3d 374, 378 (Tenn. 2002). It is well established, however, that "this right is not absolute and parental rights may be terminated if there is clear and convincing evidence justifying such termination under the applicable statute." *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988) (citing *Santosky v. Kramer*, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982)). As our Supreme Court has instructed:

> In light of the constitutional dimension of the rights at stake in a termination proceeding under Tenn. Code Ann. § 36-1-113, the persons seeking to terminate these rights must prove all the elements of their case by clear and convincing evidence. Tenn. Code Ann. § 36-1-113(c); *In re Adoption of A.M.H.*, 215 S.W.3d at 808-09; *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). The purpose of this heightened burden of proof is to minimize the possibility of erroneous decisions that result in an unwarranted termination of or interference with these rights. *In*

*re Tiffany B.*, 228 S.W.3d 148, 155 (Tenn. Ct. App. 2007); *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005). Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005), and eliminates any serious or substantial doubt about the correctness of these factual findings. *In re Valentine*, 79 S.W.3d at 546; *State, Dep't of Children's Servs. v. Mims (In re N.B.)*, 285 S.W.3d 435, 447 (Tenn. Ct. App. 2008).

*In re Bernard T.,* 319 S.W.3d at 596.

## IV. Statutory Abandonment

Tennessee Code Annotated § 36-1-113 (2014) lists the statutory grounds for termination of parental rights, providing as follows:

(a) The chancery and circuit courts shall have concurrent jurisdiction with the juvenile court to terminate parental or guardianship rights to a child in a separate proceeding, or as a part of the adoption proceeding by utilizing any grounds for termination of parental or guardianship rights permitted in this part or in title 37, chapter 1, part 1 and title 37, chapter 2, part 4.

. . .

(c) Termination of parental or guardianship rights must be based upon:

(1) A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and

(2) That termination of the parent's or guardian's rights is in the best interests of the child.

The trial court determined that Mother had abandoned the Children by failing to establish a suitable home and by demonstrating wanton disregard for their welfare through her behavior prior to incarceration. *See* Tenn. Code Ann. § 36-1-113(g)(1).

A. Failure to Provide a Suitable Home

Tennessee Code Annotated § 36-1-113(g)(1) provides, as a statutory ground for termination:

(1) Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred . . . .

Tennessee Code Annotated § 36-1-102(1)(A) (2014) defines abandonment, in relevant part, as:

(ii) The child has been removed from the home of [a] parent or parents or a guardian or guardians as the result of a petition filed in the juvenile court in which the child was found to be a dependent and neglected child, as defined in § 37-1-102, and the child was placed in the custody of the department or a licensed child-placing agency, that the juvenile court found, or the court where the termination of parental rights petition is filed finds, that the department or a licensed child-placing agency made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; and for a period of four (4) months following the removal, the department or agency has made reasonable efforts to assist [a] parent or parents or a guardian or guardians to establish a suitable home for the child, but that [a] parent or parents or a guardian or guardians have made no reasonable efforts to provide a suitable home and have demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date. The efforts of the department or agency to assist a parent or guardian in establishing a suitable home for the child may be found to be reasonable if such efforts exceed the efforts of the parent or guardian toward the same goal, when the parent or guardian is aware that the child is in the custody of the department; . . . .

 In its final order, the trial court included the following specific findings regarding Mother's failure to establish a suitable home:

In this case, pursuant to Tenn. Code Ann. §§ . . . 36-1-113(g)(1) and 36-1-102(1)(A)(ii), the Court finds that there is clear and convincing evidence that the Respondents failed to provide a suitable home to which the children could return. At the time of the hearing, the father remained incarcerated and the mother was residing with relatives. Respondents failed to make even minimal

-8-

efforts to establish a suitable home for the children, despite exhaustive reasonable efforts by DCS to assist them.

Upon a thorough review of the record, we conclude that these findings, made under a clear and convincing evidence standard, are supported by a preponderance of the evidence. The four-month determinative period for purposes of determining abandonment, pursuant to Tennessee Code Annotated § 36-1-102(1)(A), began on November 21, 2011, and concluded on March 20, 2012, the day prior to the filing of the termination petition. *See In re Jacob C.H.*, No. E2013-00587-COA-R3-PT, 2014 WL 689085 at *6 (Tenn. Ct. App. Feb. 20, 2014) (concluding that the applicable four-month statutory period preceding filing of the termination petition ends on the day preceding filing). Mother acknowledged at trial in July 2012 that she had been caught in a cycle for some time of abusing drugs, getting clean, abusing drugs again, and getting clean again. This cycle had affected her ability to maintain a stable home and employment. Moreover, the trial court continued the termination action for more than a year and heard updated testimony from Mother and DCS personnel in July and August 2013 that substantiated a similar pattern of drug abuse and temporary recovery, with a resultant lack of stability in Mother's living conditions.

At the time the Children were removed into protective custody, Mother and Father had been living together with the Children. Mother testified that since the Children's removal, she and Father had not resided together. Father was ultimately incarcerated on February 18, 2012, following convictions for aggravated burglary and reckless endangerment with a deadly weapon. He was sentenced to five years of incarceration and attended the instant proceedings while in the custody of the Tennessee Department of Correction. By the time of the final judgment, Father had been released on parole but was found by the trial court, *inter alia*, to have failed to provide a suitable home for the Children or to have substantially complied with the reasonable responsibilities and requirements of the permanency plans.

Mother's living situation is not always clear from the record. At some point following her release from jail in May 2011, she resided with her sister for approximately two months. At the time of the July 10, 2012 hearing, Mother had recently begun to reside with Grandmother. Both Mother and Grandmother testified that Mother and the Children could reside indefinitely in Grandmother's home. One year later, however, during the July and August 2013 proceedings, Mother acknowledged that she no longer resided with Grandmother and that it was no longer feasible for her to live there with the Children.

DCS family service worker Leah Baird testified at the July 12, 2013 hearing that to her knowledge, Mother was homeless at that time. Mother explained that during the year between the July 2012 and July 2013 hearings, she had resided with a cousin in Cleveland, Tennessee, for three months. She also explained that her uncle and father had died during

the year between hearings, and that she had spent several days at her father's bedside in the hospital. She did not claim to have obtained any suitable housing, and she acknowledged that grounds existed to terminate her parental rights.

On appeal, Mother asserts that by the time of the February 10, 2014 hearing on the motion to alter or amend the judgment, she had obtained both employment and housing. Mother testified that she had been employed with Arby's Restaurant for approximately four months, or since approximately November 2013. At the end of January 2014, Mother moved into her "own place," a three-bedroom house she shared with a new boyfriend. Mother explained that her boyfriend worked out of town and was only there on weekends. It was undisputed that Mother had not failed a drug screen since December 2, 2013, when she tested positive for marijuana. She had completed an intensive outpatient drug rehabilitation program, which she entered in November 2013. Upon cross-examination, Mother acknowledged that following her release from the rehabilitation program, she had resided with a program director for three months and had actually only been living drug-free on her own for approximately two weeks.

During the determinative period before the filing of the termination petition, November 21, 2011, through March 20, 2011, Mother clearly failed to establish a suitable home for the Children. Following the filing of the termination petition, proceedings continued for more than two years before the trial court found in its November 18, 2013 order that Mother still had not managed to provide a suitable home and had continued to demonstrate a pattern of drug abuse evincing such disregard for the Children as to be unlikely to provide a suitable home in the future. *See In the Matter of A.D.A.*, 84 S.W.3d 592, 599 (Tenn. Ct. App. 2002) (noting that "a suitable home requires more than a physical space" and concluding that "the inability of a parent to overcome drug addiction can provide statutory grounds for termination of parental rights" under this statutory ground).

Although the trial court had reached this finding in its November 2013 order, it allowed Mother to testify as to her situation at the time the motion to alter or amend was heard in February 2014. The trial court commended Mother on her efforts toward stability and a drug-free lifestyle in the few months prior to the February 2014 hearing. As the trial court noted, however, Mother had tested positive for marijuana in her system as recently as November 18, 2013, and December 2, 2013. Mother acknowledged her cyclical pattern of drug abuse and the newness of her current living situation with a paramour unknown to DCS and the court. We determine that the trial court did not err in terminating Mother's parental rights based upon this statutory ground.

## B. Wanton Disregard for the Children Prior to Incarceration

The trial court also found, by clear and convincing evidence, that both parents had "constructively abandoned" the Children by engaging in criminal conduct and continuing to abuse drugs prior to incarceration, thereby exhibiting wanton disregard for the Children. On appeal, DCS concedes that the trial court erred in applying this statutory ground to Mother. We agree.

The applicable definition of abandonment for this statutory ground provides that for purposes of instituting an action to terminate parental rights:

> [a] parent or guardian is incarcerated at the time of the institution of an action or proceeding to declare a child to be an abandoned child, or the parent or guardian has been incarcerated during all or part of the four (4) months immediately preceding the institution of such action or proceeding, and either has willfully failed to visit or has willfully failed to support or has failed to make reasonable payments toward the support of the child for four (4) consecutive months immediately preceding such parent's or guardian's incarceration, or the parent or guardian has engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child; . . . .

Tenn. Code Ann. § 36-1-102(1)(A)(iv) (emphasis added). The "two distinct tests" for abandonment contained in this definition "apply only if the parent is incarcerated at or near the time of the filing of the termination petition." *In re Audrey S.*, 182 S.W.3d at 865.

The instant action was instituted by the filing of a petition to terminate parental rights on March 21, 2012. Although Mother was briefly incarcerated at the time the Children were removed into protective custody in April 2011, she was not incarcerated at the time the instant action for termination of her rights was instituted, and DCS failed to show that she was incarcerated during any portion of the four months preceding the filing of the petition. The trial court erred by terminating Mother's parental rights based upon the ground of abandonment through wanton disregard for the Children prior to incarceration. We reverse the trial court's finding on this statutory ground.

### V. Substantial Noncompliance with Permanency Plans

The trial court also found clear and convincing evidence that Mother failed to substantially comply with the reasonable responsibilities set out in her permanency plans.

Tennessee Code Annotated § 36-1-113(g)(2) provides as an additional ground for termination of parental rights:

> (2) There has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan pursuant to the provisions of title 37, chapter 2, part 4[.]

In its findings regarding Mother's efforts under the permanency plans, the trial court stated in relevant portion:

> In this case, pursuant to T.C.A. §§ 36-1-113(g)(2) and 37-2-403(a)(2), the Court finds clear and convincing evidence that the Respondents failed to substantially comply with the permanency plans. Despite the more than reasonable efforts by the Department for two years, the parents have not substantially complied with the responsibilities and requirements set out for them in the permanency plans and they have failed to provide a suitable home to which the children can safely return. The Department did so by staffing permanency plans with the Respondents designed to facilitate reunification of the family, providing supervised visitation with the children to both Respondents, referring the Respondents for alcohol and drug assessments and mental health assessments, providing drug screens to the Respondents; providing in-home services to work with the Respondents on therapeutic visitation, assisting the mother with enrolling in inpatient drug treatment programs, assisting the father with enrolling in a drug treatment program, referring the Respondents to parenting classes, attempting to assist the Respondents with stable housing, providing ongoing case management, providing daily care and support for the children, providing medical and dental care for the children, and providing ongoing advice and recommendations to the Respondents.
>
> The Respondents have not refrained from criminal activity. The father was arrested on January 5, 2012 for theft, evading arrest, theft under $500.00 and trespassing. He was charged with a violation of probation in March 2012. The mother was arrested on January 12, 2012 for giving false information to an officer, not having a valid driver's license, violation of the seat belt law and violation of the registration law. Respondents have not remained drug free. On January 11, 2012 both Respondents tested positive on drug screens[.] The mother tested positive for oxycodone. She claimed to have a prescription but failed to provide a copy when requested. The father tested positive for amphetamine, methamphetamine, and oxycodone. On February 22, 2012, the

-12-

mother again tested positive for oxycodone. She has been discharged from two rehabilitation programs for noncompliance. The father completed a thirty day treatment program but did not follow the aftercare recommendations and continued to abuse drugs after completion. The Respondents do not have stable housing. The father is currently incarcerated and the mother is living with relatives.

Upon careful review, we determine that a preponderance of the evidence supports these findings. In particular, Mother's responsibilities under the permanency plans were to (1) visit the Children at least 4.3 hours per month with age-appropriate food or other supplies in hand; (2) attend meetings and court hearings regarding the Children; (3) complete an alcohol and drug assessment and follow attendant recommendations; (4) pass scheduled and random drug screens; (5) complete a mental health assessment and follow attendant recommendations; (6) complete parenting education classes and demonstrate parenting skills learned during visitation; (7) provide a "reliable, stable, safe living environment, free from drug use, harm or abuse"; (8) seek employment and provide proof of her search for or ultimate employment; (9) resolve "legal issues"; and (10) pay child support "as ordered."

It is undisputed that when Mother participated in visitation with the Children, she demonstrated appropriate parenting skills and was consistently prepared with snacks or other items for the Children. Mother consistently appeared for court hearings and participated in child and family team meetings when required. She presented proof of completion of parenting education classes. We note, however, that Mother's visitation sessions with the Children were often sporadic. Mother explained at trial that she had missed some scheduled supervised visitation sessions when she could not change her shift at work or did not have transportation. Following the July 2012 hearing, Mother did not visit the Children for three months while she resided with her cousin in Cleveland, Tennessee.

As noted in the previous section, Mother was unable to maintain steady employment or provide a suitable, stable home during the nearly three years the Children were in protective custody. Moreover, she continued to struggle with drug abuse throughout this time period. Although she successfully completed a two-week rehabilitation program on March 19, 2012, two days prior to the filing of the termination petition, Mother also had been discharged previously from two rehabilitation programs for noncompliance. At the July 2012 hearing, Mother admitted that she had tested positive for marijuana a week prior to trial. DCS presented evidence of eighteen drug screens administered to Mother between the dates of May 20, 2011, and April 9, 2012, eight of them positive for controlled substances. Ms. Baird testified that in the year between the July 2012 and July 2013 hearings, Mother had tested positive sporadically for marijuana and "benzos." Mother acknowledged at both the July 2012 and July 2013 hearings that she had not complied with the responsibilities and

requirements of her permanency plans. She repeatedly expressed that she felt much better when not using controlled substances, but she also acknowledged her tendency to turn to marijuana when under stress.

In addition, Mother complied with the requirement of completing a mental health assessment but showed difficulty following through with recommended outpatient counseling. As the trial court noted, she incurred new legal charges in January 2012, although she did eventually resolve those charges without any additional incarceration. Mother did not pay any child support while the Children were in protective custody. The trial court did not err in terminating Mother's parental rights based upon the statutory ground of substantial noncompliance with the statements of responsibilities in the permanency plans.

### VI. Persistence of Conditions Leading to the Children's Removal

The trial court also found that Mother's parental rights should be terminated based upon the statutory ground of persistence of the conditions leading to the Children's removal into protective custody. Tennessee Code Annotated § 36-1-113(g)(3) provides as an additional ground for termination of parental rights:

> The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:
>
> (A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of [a] parent or parents or [a] guardian or guardians, still persist;
>
> (B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to [a] parent or parents or [a] guardian or guardians in the near future; and
>
> (C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home; . . . .

In explaining its findings regarding this statutory ground, the trial court reiterated its findings regarding Mother's failure to provide a suitable home and failure to substantially

comply with the other reasonable responsibilities and requirements of her permanency plans. The court further found as follows in relevant part:

> There is little chance that those conditions will be remedied soon so that the children can be returned safely to the Respondents' home because for two years, DCS has made reasonable efforts to assist the Respondents to remedy them to no avail.

Upon a thorough review of the record, we conclude that these findings are supported by a preponderance of the evidence. By the time of the petition's filing in March 2012, the Children had been removed for a period of nearly a year, and by the time of the final judgment in April 2014, that period had stretched to nearly three years. The predominant conditions leading to removal as pertaining to Mother, namely Mother's drug addiction and resultant inability to care for the Children, persisted at the time of the final judgment. Mother argues that her recent success in rehabilitation and employment at the time of the February 2014 hearing demonstrated that she had conquered the conditions leading to the Children's removal. However, the evidence does not preponderate against the trial court's finding that Mother's success was too recent and short-lived to constitute assurance that the Children would not return to conditions similar to those at the time of their removal if they were returned to Mother's care. Mother stresses that she had obtained a home at the time of the February 2014 hearing, but it is undisputed that she had done so in the company of a paramour unknown to DCS or the court.

The evidence also demonstrated that continuation of the parent-child relationship would greatly diminish the Children's chances of integration into a safe, stable, and permanent home. We conclude that the trial court properly terminated Mother's parental rights based on this statutory ground as well.

## VII. Reasonable Efforts by DCS

Mother next argues that the trial court erred in finding that DCS made reasonable efforts to reunify her with the Children and therefore erred in terminating her parental rights based on substantial noncompliance with the parenting plans. The trial court found that DCS made such reasonable efforts in this case. Having carefully reviewed the record, we agree.

We have previously defined such reasonable efforts as:

"the exercise of reasonable care and diligence by the department to provide services related to meeting the needs of the child and the family." T.C.A. § 37-1-166(g)(1) (2005). "Reasonable efforts entail more than simply providing

-15-

parents with a list of service providers and sending them on their way. The Department's employees must use their superior insight and training to assist parents with the problems the Department has identified in the permanency plan, whether the parents ask for assistance or not." *In re C.M.M.*, 2004 WL 438326, at *7 (citing *In re D.D.V.*, No. M2001-02282-COA-R3-JV, 2002 WL 225891, at *8 (Tenn. Ct. App. Feb.14, 2002)). The Department's efforts, however, need not be "Herculean," and it is important to note that "the remedial responsibility does not rest solely on the Department's shoulders. Parents must also make reasonable efforts to rehabilitate themselves and to remedy the conditions that required them to be separated from their children." *Id.* (citing *In re R.C.V.*, No. W2001-02102-COA-R3-JV, 2002 WL 31730899, at *12 (Tenn. Ct. App. Nov.18, 2002)). The State has the burden of proving by clear and convincing evidence that its efforts at reunification were reasonable under all of the circumstances. *Id.* at *8; *see* T.C.A. § 36-1-113(c) (2005).

*State Dep't of Children's Servs. v. Estes*, 284 S.W.3d 790, 800-01 (Tenn. Ct. App. 2008).

The trial court specifically found that DCS had made reasonable efforts to assist Mother and Father by:

staffing permanency plans with the Respondents designed to facilitate reunification of the family, providing supervised visitation with the children to both Respondents, referring the Respondents for alcohol and drug assessments and mental health assessments, providing drug screens to the Respondents; providing in-home services to work with the Respondents on therapeutic visitation, assisting the mother with enrolling in inpatient drug treatment programs, assisting the father with enrolling in a drug treatment program, referring the Respondents to parenting classes, attempting to assist the Respondents with stable housing, providing ongoing case management, providing daily care and support for the children, providing medical and dental care for the children, and providing ongoing advice and recommendations to the Respondents.

On appeal, Mother acknowledges Ms. Baird's exhaustive efforts to provide Mother with visitation with the Children, which Mother's counsel stipulated at trial were efforts "above and beyond" the norm. Mother asserts, however, that DCS's other assistance to Mother consisted of little more than "giving an illiterate woman telephone numbers." Upon our thorough and careful review of the record, we determine this characterization to be disingenuous. Mother testified that Ms. Baird had taken time on several occasions to explain

documents and requirements to her in language she could understand. Mother completed two rehabilitation programs and was discharged from two others during the pendency of these proceedings. There is no indication in the record that Mother was ignorant of the resources available to her or that DCS had failed to make these resources known. DCS clearly exercised "reasonable care and diligence . . . to provide services related to meeting the needs of the child and the family" in this case. *See* Tenn. Code Ann. §37-1-166(g)(1).[4] This issue is without merit.

## VIII. Best Interest of Children

When a parent has been found to be unfit by establishment of a statutory ground for termination of parental rights, as here, the interests of parent and child diverge, and the focus shifts to what is in the child's best interest. *In re Audrey S.*, 182 S.W.3d at 877. Tennessee Code Annotated § 36-1-113(i) (2014) provides a list of factors the trial court is to consider when determining if termination of parental rights is in the child's best interest. This list is not exhaustive, and the statute does not require the court to find the existence of every factor before concluding that termination is in a child's best interest. *In re Audrey S.*, 182 S.W.3d at 878 ("The relevancy and weight to be given each factor depends on the unique facts of each case."). Further, the best interest of a child must be determined from the child's perspective and not the parent's. *White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004).

Tennessee Code Annotated § 36-1-113(i) lists the following factors for consideration:

> (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
>
> (2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services

---

[4]We are unconvinced by Mother's argument that the trial court's initial reluctance to terminate Mother's parental rights without assurance that the foster parents were procedurally set to adopt the Children somehow meant that the trial court and DCS were attempting to serve the foster parents' interest over the Children's interest. Upon its motion to alter or amend the judgment, DCS properly explained to the trial court that pursuant to Tennessee Code Annotated §§ 36-1-113 (h) and (p), respectively, DCS was required to seek termination of parental rights on statutory grounds and could only then, after having obtained termination, assist the foster parents in filing a subsequent petition for adoption with the order terminating parental rights attached.

agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances[5] as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

---

[5]Effective July 2012, after the filing of the petition in the instant case, The Tennessee General Assembly amended Tennessee Code Annotated § 36-1-113(i)(7) to substitute "alcohol, controlled substances or controlled substance analogues" in place of "alcohol and controlled substances." *See* 2012 Pub. Acts ch. 848, § 8.

In ultimately determining in its amended final judgment, by clear and convincing evidence, that termination of Mother's parental rights was in the best interest of the Children, the trial court stated in pertinent part:

a.  The parents have not made changes in their conduct or circumstances that would make it safe for the children to go home. The parents still have unaddressed substance abuse issues and have not maintained safe and stable housing. The father has not resolved his legal issues.

b.  The parents have not made lasting changes in their lifestyle or conduct after reasonable efforts by the state to help, so that lasting change does not appear possible. Despite help from the state [for] two years, the parents continued to abuse drugs, the father returned to incarceration, and the parents have not obtained and maintained safe and stable housing.

c.  There is crime in Respondent[s'] home. Both parents have been charged with criminal offenses since the children were removed from their home.

d.  The parents abuse drugs, rendering them consistently unable to care for the children in a safe and stable manner. Both parents have unresolved substance abuse issues and have continued to test positive for illegal substances since the children were removed from their home.

e.  The children have established a strong bond with their foster parents, who wish to adopt them. The children were just two years old and four months old at the time they were removed from their parents. They are now five years old and three years old. They have spent the majority of their young lives with the foster parents . . . . The [foster parents] were neighbors of the family who volunteered to take the children into their home at the time of removal and later became foster parents.

The trial court therefore concluded that it was in the Children's best interest to terminate Mother's parental rights. We agree.

Mother's argument regarding this issue is grounded in her contention that the trial court's finding was "fatally flawed" because the court "failed to make specific factual findings" as to the best interest analysis. Contrary to Mother's assertion, the trial court's findings indicate that it analyzed the factors contained in Tennessee Code Annotated § 36-1-

113(i) in determining that termination was in the Children's best interest. In particular, the trial court's findings show that it weighed the following factors against maintaining Mother's parental rights: (1) failure to make adjustment of circumstance, conduct, or conditions as to make it safe and in the Children's best interest to be in Mother's home; (2) failure to effect a lasting adjustment after reasonable efforts by DCS for such a period of time that adjustment does not reasonably appear possible; (4) lack of a meaningful relationship between Mother and the Children due to the Children's having resided the majority of their lives with the foster parents; (5) negative effect a change of caretakers and physical environment is likely to have on the Children's emotional, psychological, and medical condition; (6) neglect shown toward the Children while in Mother's home; (7) criminal activity and use of controlled substances in the home; and (8) Mother's mental status in terms of her drug addiction that would prevent her from effectively providing safe and stable care and supervision.

At trial, the court noted Mother's love for the Children, overall honesty with the court regarding her addiction problems, and repeated attempts to rehabilitate herself. The court found, however, that Mother had been unable to make the changes necessary to allow the Children's safe return to her care. In regard to the statutory factors, we note also that Mother's visitation with the Children was demonstrated to be sporadic and that Mother undisputedly did not pay child support at any time while the Children were in protective custody. *See* Tenn. Code Ann. §§ 36-1-113(i)(3), (9); *White*, 171 S.W.3d at 194 (taking notice of the appellate record in affirming the trial court's best interest findings). From a thorough examination of the record before us, we conclude that there is clear and convincing evidence that termination of Mother's parental rights was in the Children's best interest.

## IX. Conclusion

The decision of the trial court is affirmed in part and reversed in part. We reverse the trial court's finding that Mother abandoned the Children through wanton disregard for their welfare prior to her incarceration. We affirm the trial court's judgment in all other respects. Costs on appeal are assessed equally to the appellant, Fleesha J., and the appellee, the State of Tennessee, Department of Children's Services. This case is remanded to the trial court, pursuant to applicable law, for enforcement of the trial court's judgment terminating parental rights and collection of costs assessed below.

_____
THOMAS R. FRIERSON, II, JUDGE